UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA HALL,<br><br>    Plaintiff,<br><br>    v.<br><br>CULTURAL CARE USA, et al.,<br><br>    Defendants. | Case No. 3:21-cv-00926-WHO<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 57, 62, 68, 71 |

The plaintiffs in these consolidated putative class actions worked as local childcare coordinators ("LCCs") who coordinated the work of individuals in the United States on "au pair" visas. Defendant Cultural Care, Inc. ("Cultural Care"), a sponsor for the program, classified the plaintiffs as independent contractors. The plaintiffs filed this suit alleging that they should have been classified as employees under California law.

Both parties move for summary judgment on misclassification; the plaintiffs' motion is granted and Cultural Care's is denied. The parties' central disagreement is which legal test for classification—the *Borello* test or the ABC test—applies. During the class period here, the law was settled that the ABC test, which is better for the plaintiffs, would govern. To resist this, Cultural Care relies on a 2020 statute providing that the *Borello* test, which is better for Cultural Care, would apply to LCCs—and that it would do so retroactively. To the extent that provision would retroactively diminish wages that the plaintiffs had already earned, it violates the California Constitution's guarantee of due process. Once the ABC test is applied, it is clear that the plaintiffs should have been classified as employees and are entitled to summary judgment.

**BACKGROUND**

The U.S. Department of State operates an "Exchange Visitor Program" as part of its

statutory mandate to "increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchanges." 22 C.F.R. § 62.1(a). One aspect of that program gives special visas to certain groups of foreign citizens to come to the United States to foster cultural and educational exchanges. *See id. et seq*. A purpose for which the program exists is to admit what State Department (and the parties here) refer to as au pairs. *See id.* § 62.31(a). Au pairs "live with an American host family and participate directly in the home life of the host family" to provide "child care services" while attending an American "post-secondary educational institution." *Id.*

Cultural Care is a "sponsor" for the program. Under regulations, the State Department "designate[s]" sponsors to perform a variety of roles. *Id.* § 62.31(c). Those roles are discussed in more detail below because they are a key part of the parties' dispute. At a high level, sponsors coordinate the program for au pairs. *See id.* (listing requirements). That includes placing au pairs with host families, *id.* § 62.31(e), holding an orientation according to State Department requirements, *id.* § 62.31(f), training au pairs in "child development" and "child safety," *id.* § 62.31(g), "screen[ing]" host families for various requirements, *id.* § 62.31(h), providing an orientation for host families, *id.* § 62.31(i), ensuring au pairs are correctly compensated, *id.* § 62.31(j), ensuring au pairs receive proper time off and vacation, *id.*, ensuring au pairs meet their educational requirements, *id.* § 62.31(k), "monitor[ing]" au pairs, *id.* § 62.31(l), and fulfilling reporting requirements to the government, *id.* § 62.31(m).

Cultural Care and other sponsors employ or contract with (depending on which party's argument is correct) a class of individuals that the regulations refer to as "local counselor[s]," *id.* § 62.31(i)(4), or "local organizational representative[s]," *id.* § 62.31(c)(5). The parties here refer to them as local childcare coordinators (as noted, "LCCs") and I do the same. Named plaintiffs Melissa Hall, Nicole Ludwig, and Paula Ventura were LCCs for Cultural Care at various points between April 2016 and November 2020. *See* Plaintiffs' Consolidated Motion for Summary Judgment (Pl. Mot.") [Dkt. No. 62] 4 n.2 (collecting citations). Cultural Care classified LCCs as independent contractors. *See, e.g.*, *id* 6; Opposition to the Pl. Mot. ("Pl. Oppo.") [Dkt. No. 78] 5 (agreeing).

These three consolidated cases were filed individually in California state court and removed to this court in February 2021. *See, e.g.*, Dkt. No. 1.[1] The plaintiffs allege that Cultural Care misclassified them as independent contractors; they claim that they should have been classified as employees under California law. The cases were eventually consolidated, *see* Dkt. No. 27, and the plaintiffs filed their operative complaints. *See, e.g.*, Second Amended Complaint ("SAC") [Dkt. No. 42]. The SAC includes a variety of claims under the California labor law, such as failure to pay wages owed and failure to provide full required breaks, that depend on their misclassification theory, and a derivative claim under the Unfair Competition Law ("UCL"). *See generally id.* The parties now both move for summary judgment on various issues.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

---

[1] References to the docket are to *Hall v. Cultural Care, Inc.*, 3:21-cv-00926-WHO, unless otherwise noted.

3

**DISCUSSION**

Both parties move for summary judgment on the core issue of whether Cultural Care misclassified LCCs as independent contractors instead of employees under California law. *See generally* Defendant's Motion for Summary Judgment ("Def. Mot.") [Dkt. No. 57]; Pl. Mot. And the plaintiffs move for summary judgment on claims and affirmative defenses that are derivative of this determination. *See generally* Pl. Mot.[2]

**I.   THE PROPER TEST**

The parties raise a common issue in California-law misclassification suits: the proper test to determine whether someone is an employee or an independent contractor. There are two possible tests that can apply, the *Borello* test and the *Dynamax* or "ABC" test. *See Hill v. Walmart Inc.*, 32 F.4th 811, 819 (9th Cir. 2022).

For many years, the prevailing test under California law arose from the California Supreme Court's decision in *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989), which interpreted the California Labor Code as requiring courts to primarily assess the extent of control exercised over the performance of the work and set out a list of secondary factors to then consider. In 2018, the California Supreme Court held in *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903 (2018), that the ABC test would apply to claims arising from the state's wage orders.[3] Under that test, individuals are presumed to be employees, not independent contractors. *Dynamex*, 4 Cal. 5th at 955. Then, the burden is on the putative employer to overcome that presumption. *Id.* It can do it only by showing that three conditions are met:

> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (b) that the worker performs work that is outside the usual course of the hiring entity's business; and (c) that the worker is customarily engaged in an *956 independently established trade, occupation, or business of the same nature as that involved in the work performed.

---

[2] The plaintiffs initially moved for summary judgment on more affirmative defenses, but Cultural Care has now formally withdrawn them. *See* Pl. Oppo. 24

[3] California wage orders "are constitutionally-authorized, quasi-legislative regulations that have the force of law," *Dynamex*, 4 Cal. 5th at 914 n.3 (citations omitted).

*Id.* at 955–56.

The California Supreme Court has held that use of the ABC test applies retroactively to reach claims that were not final before its 2018 decision. *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 10 Cal. 5th 944, 948 (2021). As a result (so long as a putative employee's claims are subject to the state's wage orders), the ABC test governs unless an exception applies. *See, e.g.*, *Garcia v. Border Transportation Grp., LLC*, 28 Cal. App. 5th 558, 571 (2018), *as modified on denial of reh'g* (Nov. 13, 2018).

In 2019, the California Legislature codified the use of the ABC test as the California Supreme Court articulated it but carved out specified statutory exceptions to which the *Borello* test would continue to apply. *See* Cal. Labor Code § 2775. In 2020, the Legislature added more exceptions. Cultural Care points to one statutory exception imposed by the Legislature in 2020. *See, e.g.*, Def. Mot. 18. That statute provides in relevant part that the statutory ABC test "and the holding in *Dynamex* do not apply to the following occupations as defined in the paragraphs below, and instead, the determination of employee or independent contractor status for individuals in those occupations shall be governed by *Borello*." Cal. Lab. Code § 2783. One of those below-defined occupations is:

> An individual who is engaged by an international exchange visitor program that has obtained and maintains full official designation by the United States Department of State under Part 62 . . . of Title 22 of the Code of Federal Regulations for the purpose of conducting, instead of participating in, international and cultural exchange visitor programs and is in full compliance with Part 62 . . . of Title 22 of the Code of Federal Regulations.

*Id.* § 2783(i). The Legislature enacted a retroactivity provision for this and other exceptions: "Insofar as the application of Sections 2776 to Section 2784 would relieve an employer from liability, those sections shall apply retroactively to existing claims and actions to the maximum extent permitted by law." Cal. Lab. Code § 2785(b).

There is no dispute that the plaintiffs here are the precise class of people that Section 2783(i) applies to. Their claims, however, are from April 2016 to November 2020. *See* Pl. Mot. 4 n.2 (collecting citations). If there were no retroactivity provision to Section 2783(i), the ABC test would presumably govern because there is no other sufficient indication in the exception that it

would apply retroactively. *See McClung v. Emp. Dev. Dep't*, 34 Cal. 4th 467, 475 (2004) (holding that a statute must clearly show it was intended to apply retroactively). The question, then, is whether the retroactivity provision of Section 2785(b) applies to these plaintiffs' claims.

The plaintiffs offer two ways to get around the retroactivity provision: One is statutory, the other constitutional.

In their statutory argument, the plaintiffs assert that the retroactivity provision does not mean quite what it appears to say. *See* Opposition to the Def. Mot. ("Def. Oppo.") [Dkt. No. 67] 20–23. They argue that the statute is not clear enough to apply retroactively because it does not explicitly state that it applies to claims that arise under wage orders. *See id.* They are right to the extent that statutes that affect preexisting rights have to be clear: "[t]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *McClung*, 34 Cal. 4th at 475 (internal quotation marks and citation omitted). Accordingly, as a matter of California law, a "statute may be applied retroactively only if it contains express language of retroactivity or if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application." *Id.* (internal quotation marks and citation omitted). But Section 2785(b) is just such a statute. The relevant part says that specific exemptions, all of which explicitly discuss *Dynamix* and *Borello*, "shall apply retroactively to existing claims and actions to the maximum extent permitted by law." The Legislature was as clear as it could be.[4]

In their constitutional argument, the plaintiffs contend that applying this exception retroactively violates the California Constitution. *See* Pl. Mot. 26–31; Def. Oppo. 23–25. For the reasons that follow, I agree.

---

[4] The other half of the plaintiffs' statutory argument focuses on the other half of Section 2785(b), which provides that the exceptions apply retroactively only "[i]nsofar as the application of [the exceptions] would relieve an employer from liability." The plaintiffs contend that they would also be employees under the *Borello* test, so retroactive application would not relieve Cultural Care from liability. *See* Def. Oppo. 20–23. But that does not move the ball in their direction: their position would still require application of the *Borello* test, so the question of retroactivity would be purely academic under this argument.

6

The California Constitution circumscribes what laws can apply retroactively. When an individual has a vested right to wages that she has earned, that is a property right. *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 168 (2000) ("Once earned, those unpaid wages became property to which the employees were entitled."); *Loehr v. Ventura Cnty. Cmty. Coll. Dist.*, 147 Cal. App. 3d 1071, 1080 (1983) (essentially same). And the California Supreme Court has "long held that the retrospective application of a statute may be unconstitutional if it . . . deprives a person of a vested right without due process of law." *In re Marriage of Buol*, 39 Cal. 3d 751, 756 (1985) (collecting citations). Consequently, if the plaintiffs would receive lower wages under the *Borello* test than under the ABC test (due to being found to be independent contractors rather than employees), applying that test would have to accord with the California Constitution's retroactivity rule. *Cf. id.*[5]

To determine whether a retroactive law violates due process, the California Supreme Court has instructed courts to examine:

> the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions.

*Buol*, 39 Cal. 3d at 761 (internal quotation marks and citation omitted). But if retroactive application is "necessary" to further a "sufficiently important state interest," it will not violate due process. *Id.* (internal quotation marks and citations omitted).

Here, application of a law that would retroactively take away wages that individuals earned under the then-operative law fails this test and violates due process.

I begin with first two related factors, the "significance of the state interest served by the law" and "the importance of the retroactive application of the law to the effectuation of that

---

[5] Cultural Care relies on *Graczyk v. Workers' Comp. Appeals Bd.,* 184 Cal. App. 3d 997 (1986), to argue that the plaintiffs did not have vested property rights *at all*. Neither that case nor any other I have found supports Cultural Care's argument. All that *Graczyk* held was that a worker's compensation award was not vested until reduced to final judgment. *See id.* at 1006. But a worker's compensation award—an adjudicative judgment akin to a judicial judgment—is far different from wages which, as explained in-text, vest when they are *earned*.

7

1    interest." *Id.* (internal quotation marks and citation omitted). The only governmental interest that
2    Cultural Care puts forward is that the statute ensures "consistency and stability" for putative
3    employers and employees. Pl. Oppo. 12–13. While a clear legal regime governing employment
4    tests is no doubt valuable, this retroactivity provision (which is the focus of the analysis) is not of
5    much "importance" to the "effectuation of that interest." That is because retroactive application
6    *unsettles* rather than settles the status of legal rights. Prior to the enactment of the exception, ABC
7    applied—and applied retroactively. *Vazquez*, 10 Cal. 5th at 953. From the time between
8    *Dynamax* and the 2020 enactment of the exception, both employers and employees necessarily
9    relied on application of the ABC test. And the California Supreme Court held in no uncertain
10   terms that reliance interests favored retroactive application to before 2018 as well. *See id.* It was
11   only in 2020 that the Legislature cast that reliance into doubt, creating less stability and less
12   consistency. These factors, consequently, favor the plaintiffs.

13   I turn to reliance factors: "the extent of reliance upon the former law, the legitimacy of that
14   reliance, the extent of actions taken on the basis of that reliance, and the extent to which the
15   retroactive application of the new law would disrupt those actions." *Buol*, 39 Cal. 3d at 761
16   (internal quotation marks and citation omitted). As the preceding discussion makes clear, both
17   putative employers and employees reasonably relied on the ABC test to apply from the day
18   *Dynamax* was handed down. And the California Supreme Court has already rejected the argument
19   that parties would reasonably have relied on the *Borello* test before *Dynamax* in holding the ABC
20   test retroactive. As it explained, "it is important to understand that California's wage orders have
21   included the suffer or permit to work standard [from which the ABC test comes] as one basis for
22   defining who should be treated as an employee for purposes of the wage order for more than a
23   century." *Vazquez*, 10 Cal. 5th at 953. In all that time, "the suffer or permit to work standard has
24   been understood as embodying the broadest definition of employment for extending coverage of a
25   social welfare statute." *Id.* (internal quotation marks and citations omitted). While the
26   "[d]efendant contends that prior to *Dynamex*, a putative employer would have reasonably
27   anticipated that the question whether a worker should properly be classified as an employee or
28   independent contractor for purposes of the obligations imposed by an applicable wage order would

be governed by the *Borello* decision . . . . *Borello* was not a wage order case and that decision did not purport to determine who should be interpreted to be an employee for purposes of a wage order." *Id.* (internal quotation marks and citation omitted). Accordingly, the court "resolved this question for the first time in *Dynamex*." *Id.* As a result, the reliance factors also disfavor retroactivity. As Cultural Care itself emphasizes, reliance interests in employment are critical. *See* Pl. Oppo. 12–13 (touting the importance of "stability" and "consistency" in employment rules).

To resist this, Cultural Care argued at the hearing that a collection of declarations and deposition excerpts in the record showed that none of the named plaintiffs relied on their status as employees during this time. But that misses the point. The issue here is reliance on *which test applied*, not on the *outcome* of that test.

Accordingly, retroactive application of *Borello* does not sufficiently effectuate an important state interest and it would vitiate the reasonable reliance that putative employers and employees had on the ABC law that preceded it. Indeed, no judicial decision that I have found (or Cultural Care cites) has ever operated to retroactively take away wages from putative employees that they had properly earned under then-operative law.[6] That makes sense because, as *Dynamax* explained, the "fundamental purpose[]" of the Labor Code and wage orders is protection of *employees* and ensuring that they are paid fair wages. *Dynamex*, 4 Cal. 5th at 952.

I also note that the retroactivity section of the statute itself states that it only applies retroactively *to the extent otherwise permitted by law*. *See* Cal. Lab. Code § 2785(b). Because the California Constitution would bar its application in certain circumstances, it would not apply by its own terms.

Cultural Care worries that this holding will fling the Labor Code into chaos. *See, e.g.*, Pl. Oppo. 10–18. But, from the application of the 2020 exceptions onward, this carve-out will apply

---

[6] I asked Cultural Care at the hearing if it had an example of such a decision; it cited my decision in *Sportsman v. A Place for Rover, Inc.*, 537 F. Supp. 3d 1081 (N.D. Cal. 2021). That case did not address retroactivity or its constitutionality. All I found there was that, under either the ABC or *Borello* test, the plaintiffs were independent contractors. *See id.* at 1085. I discuss the merits of that case below.

1  prospectively. So the only claims that will be affected are the narrow class of claims from that
2  point back until the statute of limitations started running—hardly the stuff of statewide
3  pandemonium. And anyway, the test for constitutionality already takes into account these
4  interests, as explained above.

5      Accordingly, there is no need to perform the *Borello* test in this case: If I did so and it
6  resulted in a worse result for the plaintiffs than the ABC test, applying it would be
7  unconstitutional. And, as I explain below, the ABC test leads to the conclusion that the plaintiffs
8  are employees of Cultural Care.

9  **II.  APPLICATION OF THE ABC TEST**

10      As noted, under the ABC test, Cultural Care is presumed to be an employer of the
11  plaintiffs and has the burden of showing it is not. *Dynamex*, 4 Cal. 5th at 957. To do so, it would
12  have to show "(A) that the worker is free from the control and direction of the hiring entity in
13  connection with the performance of the work, both under the contract for the performance of the
14  work and in fact; *and* (B) that the worker performs work that is outside the usual course of the
15  hiring entity's business; *and* (C) that the worker is customarily engaged in an independently
16  established trade, occupation, or business of the same nature as the work performed." *Id.*
17  (emphasis in original).

18      Here, the plaintiffs are entitled to summary judgment that they were misclassified for two
19  independent reasons. To start, the plaintiffs argued in their motion for summary judgment (and
20  their opposition to Cultural Care's motion for summary judgment) that they were entitled to
21  summary judgment on misclassification under the ABC test. *See* Pl. Mot. 15–18, 19–24; Def.
22  Oppo. 20–26. Yet none of Cultural Care's briefing responded to this; instead, it focused solely on
23  the argument that *Borello* applies and, under *that* test, Cultural Care wins on misclassification.

24      There is overlap between the "A" in ABC and the *Borello* test because both address control
25  (though from opposite viewpoints). But Cultural Care has offered no evidence or argument about
26  the "B" and "C" of the ABC test. When a party opposes summary judgment, it must identify the
27  evidence supporting its position. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact ... is
28  genuinely disputed must support the assertion by ... citing to particular parts of materials in the

record."); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nomnoving party to identify with reasonable particularity the evidence that precludes summary judgment." (internal quotation marks and alteration omitted)). That Cultural Care responded to other arguments but not to this one, and that the plaintiffs made a prima facie showing that they are entitled to judgment as a matter of law, entitles the plaintiffs to summary judgment.

Even setting this aside, the plaintiffs have met their summary-judgment burden to show they prevail on the merits of the B and C prongs of the ABC test. Cultural Care has not shown otherwise or introduced genuine disputes of material fact.

To meet the B prong of the test, the hiring entity has to ultimately demonstrate "that the worker performs work that is outside the usual course of the hiring entity's business." *Dynamex*, 4 Cal. 5th at 957. To test this, courts have employed several analytical frames, including "whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in." *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021).

Here, no matter how the inquiry is framed, the evidence is uncontested that Cultural Care's "usual course of . . . business" readily encompasses what the plaintiffs do. No one disputes that Culture Care's business is coordinating the au pair program. And as Cultural Care admits, that coordination is predominantly executed by LCCs, including the plaintiffs. *See, e.g.*, Def. Mot. 11–12 ("Cultural Care [] engage[d] LCCs to handle all routine and emergency matters arising from au pairs' participation in the Au Pair Program and, among other things, maintain regular contact with au pairs and host families during the program year and record all such contacts."); *id.* 12 (describing LCCs as "acting on Cultural Care's behalf" in "all" matters with au pairs and host families). The LCCs were not merely incidental to Cultural Care's work, they were central and necessary. They were carrying out the precise tasks of the business Cultural Care is in. Prevailing on this prong, alone, entitles the plaintiffs to summary judgment.

To meet the C prong of the test, the hiring entity has to ultimately demonstrate "that the

11

worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." *Dynamex*, 4 Cal. 5th at 957. This analysis focused on whether the putative employee "fits the common conception of an independent contractor—an individual who independently has made the decision to go into business for himself or herself and generally takes the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide services of the independent business to the public or to a number of potential customers, and the like." *Garcia*, 28 Cal. App. 5th at 573 (internal quotation marks, alterations, and citations omitted).

Here, there is nothing in the record that the named plaintiffs (or other LCCs) are engaged in some independent venture in which they perform LCC-type work on their own or for other entities. And, indeed, that would seem impossible unless it were for another entity like Cultural Care because the State Department regulations require that an entity be certified as a sponsor. *See* 22 C.F.R. § 62.31(c). As noted, Cultural Care's briefing did not respond to these arguments by the plaintiffs. Accordingly, the plaintiffs would be entitled to summary judgment on this prong.

At the hearing on these motions, for the first time, Cultural Care offered a counterargument on the B and C prongs. It argued that some of the points it made about the *Borello* test might apply to the B and C prongs of the ABC test. In particular, counsel contended that the State Department closely regulates how sponsors have to carry out their duties and anything required by the regulations cannot be factored into the B and C prong analysis. He pointed out that it had made a related argument about the impact of State Department regulation on the control analysis under the *Borello* test in its briefing, so those same basic arguments could apply here even if not made in the papers. Because it never applied these principles to the B and C analyses in any of its three briefs (across two motions), the plaintiffs did not have a fair opportunity to contest the point. But if I were to consider it on the merits, the argument is unpersuasive.

The principles this regulation argument invokes are strictly about the control analysis under *Borello*; they have no bearing on the B or C prongs of the ABC test. The basic idea is that, when assessing the degree of control exercised under *Borello*, the "putative employer does not exercise any degree of control merely by imposing requirements mandated by government

regulation." *Linton v. Desoto Cab Co., Inc.*, 15 Cal. App. 5th 1208, 1223 (2017). Or to say it a slightly different way, "the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship." *Sida of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d 354, 359 (9th Cir. 1975). This principle, if confined to its proper scope, makes sense: when the government requires the hiring entity to make its employee or independent contractor do something or refrain from doing something, that tells us nothing about whether that individual is an employee or independent contractor. Take, for instance, a law capping taxicab driver leases to ten hours per day. If the taxi company follows that law and caps drivers' leases to ten hours per day, it does not assist in determining whether they exercise control under *Borello*. *N.L.R.B. v. Friendly Cab Co.*, 512 F.3d 1090, 1098 n.7 (9th Cir. 2008) (so holding about this law). In situations like this, hiring entities act essentially as enforcers or conduits for government regulation.

But the B and C prongs of the ABC test are not focused on control; even if importing this government regulation doctrine from *Borello* into the A prong of the ABC test were correct (which I do not decide), it does not graft onto the B and C aspects. The B prong focuses on the usual course of the hiring entity's business to ask whether the worker performs work outside it. *See Dynamex*, 4 Cal. 5th at 957. The C prong focuses on the customary engagement of the worker aside from for the hiring entity. *See id.* Neither one asks about control. There is no reason, under them, to determine how many of the hiring entity's requirements are government-mandated. Indeed, it is unclear just what Cultural Care's novel argument would require under these analyses.

There is another reason that Cultural Care's government regulation argument does not change the outcome here: it stretches the legal principle far past its boundaries. The principle is that when the government imposes requirements on employees/independent contractors, and the hiring entity merely enforces them, that enforcement is not treated as "control" under *Borello*. *See, e.g.*, *Linton*, 15 Cal. App. 5th at 1223. But Cultural Care, without stating it is doing so, recasts the principle as far more sweeping. On its reading, whenever the government regulates the *hiring entity*, things that the putative employee does within the scope of *that* regulated work do not count toward the control analysis. *See, e.g.*, Def. Mot. 21. So, for instance, Cultural Care points

1    out that the State Department has many regulations about what sponsors need to do to carry out
2    their responsibilities. It argues that when the LCCs do work in the scope of what the State
3    Department requires of *Cultural Care*, *that* activity does not count toward control. *See, e.g.*, Def.
4    Mot. 22 ("All of Cultural Care's policies and procedures as they apply to LCCs are a reflection of
5    the responsibility of Cultural Care to operate a cultural exchange program in line with the
6    regulations set forth by the Department of State."); *id.* ("Cultural Care sets such expectations for
7    LCCs in accordance with the purpose and intention of the Regulations, including the obligation to
8    promote the health, safety, and welfare of au pairs."). That is a far cry from the narrow rule
9    established in the caselaw. Much of Cultural Care's control analysis assumes away anything it
10   does to comply with its *own* obligations under the State Department regulations on this basis. Its
11   argument fails on its own terms.
12         Cultural Care cites several district-court cases, but none had salient facts like the ones here.
13   In particular, Cultural Care relies heavily on my decision in *Sportsman v. A Place for Rover, Inc.*,
14   537 F. Supp. 3d 1081 (N.D. Cal. 2021). There, I found that a pet care provider was not an
15   employee of the online platform that connected pet owners and care providers. I applied both the
16   *Borello* and ABC tests, so much of my analysis focused on control. Contrary to Cultural Care's
17   arguments, *Sportsman* had quite different material facts than here and its analysis of the B and C
18   prongs sheds no light on these facts. On the B prong, I found that the defendant simply provided a
19   "marketplace . . . that allows Pet Owners to find and connect with Pet Care Providers." *Id.* at
20   1094. Unlike even other "gig economy" platforms, I found, the platform's business was solely to
21   connect the two parties, while pet care providers carried out their own care. *See id.* 1094–96. As
22   explained above, Cultural Care's business is precisely what the LCCs execute day in, day out. On
23   the C prong, I found that that named plaintiff "held herself out" as an independent contractor on
24   the platform, touted her long and independent experience, and that the particular evidence there
25   showed she operated "as an independent business." *Id.* 1097–98. Here, as explained above, there
26   is no evidence that Cultural Care has pointed to that the named plaintiffs carry out LCC-type work
27   (or any other work, for that matter) outside of doing so for Cultural Care.
28         Accordingly, the plaintiffs have shown they are entitled to summary judgment that they

were misclassified as independent contractors under the ABC test.[7]

## III. JUDICIAL ESTOPPEL

Cultural Care argues that the plaintiffs are judicially estopped from claiming that they are employees because they characterized themselves that way in their tax filings with the IRS (and received more favorable tax treatment as a result). *See* Def. Mot. 34–35. I disagree.

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). Whether a party is judicially estopped usually depends on whether there was a "clearly inconsistent" earlier position, whether that position was accepted such that the later tribunal would be misled, and whether the party making the claims would receive an unfair or unjust advantage. *See id.* 782–83.

Here, the plaintiffs classified themselves as independent contractors with the IRS *because that is how Cultural Care classified them*. Correcting that alleged misclassification is precisely why they brought this suit. Indeed, if they had done otherwise, they may have opened themselves up to potential legal consequences. So there is no clear inconsistency, no misleading effect, and no unfair advantage. *See id.*

## IV. DERIVATIVE CLAIM AND AFFIRMATIVE DEFENSE

The plaintiffs also move for summary judgment on their inaccurate wage statement claim and on Cultural Care's affirmative defenses of non-employee status and cultural exchange program inclusion. *See* Pl. Mot. 19–35; *see also* Pl. Oppo. 25 (not withdrawing these affirmative defenses). The two affirmative defenses are derivative of the misclassification analysis. Cultural Care does not dispute that if the plaintiffs prevail on misclassification, the wage statements were inaccurate as a result. Accordingly, summary judgment on this claim and these affirmative defenses is granted.

---

[7] If the *Borello* test applied, I would deny both parties' motions for summary judgment. The dueling evidence of control or lack thereof introduced by the parties requires contextual determinations by a jury.

## V. MOTIONS TO SEAL

The parties move to seal information such as IRS filings and tax returns of particular individuals. Dkt. Nos. 68, 71. The motion is granted and the material can remain under seal. Sealing this material meets the "compelling reasons" standard because it is sensitive, confidential information about particular individuals and is not relevant to the resolution of any issue in the case. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).

## CONCLUSION

The plaintiffs' motion for summary judgment on misclassification and the derivative claim and affirmative defenses is GRANTED. The defendants' motion for summary judgment is DENIED. The trial in this case is set for October 11, 2022, with a pre-trial conference on September 12. The case management conference set for August 30, 2022 is vacated. I am referring this matter to Magistrate Judge Alex Tse for settlement.

**IT IS SO ORDERED.**

Dated: July 22, 2022

William H. Orrick
United States District Judge